ROWE et ux. v. HILL et al.

(District Court, E. D. Kentucky. May 13, 1912.)

No. 90

JUDGMENT (§ 677*)—PERSONS CONCLUDED—PERSONS REPRESENTED BY PARTIES.
   Complainants, I. W. Rowe and wife, purchased and took a warranty deed for a tract of land, with knowledge of an adverse claim by defendant to a portion of the tract arising out of a dispute as to the boundary of an older grant from the state owned by defendant. Before their deed was recorded, defendant brought suit in a state court to quiet her title against their grantor, also making J. W. Rowe, as she understood the name of the purchaser to be, a defendant. Complainant's grantor defended the suit in his own name and that of J. W. Rowe; the result being a judgment establishing defendant's boundary which was affirmed on appeal. Held, on evidence, that complainants knew of the suit and relied on their grantor to defend it pursuant to his warranty, that they were bound by the judgment, and could not subsequently maintain a suit in a federal court to again litigate the same issue.
   [Ed. Note.—For other cases, see Judgment, Cent. Dig. §§ 1062, 1193; Dec. Dig. § 677.*]

In Equity. Suit by I. W. Rowe and Hannah Rowe, husband and wife, against John Hill, Nancy Hill, Sam Kidd, Pinkie Kidd, and W. A. Kinnie. On final hearing. Decree for defendants.

Sam C. Hardin, of London, Ky., and Johnson & Snyder, of Williamsburg, Ky., for plaintiffs.

O. H. Waddle, of Somerset, Ky., and Edwin P. Morrow, of Covington, Ky., for defendants.

COCHRAN, District Judge. This cause is before me for final decree. Of the five defendants, Pinkie Kidd, wife of the defendant, Sam Kidd, and adopted daughter of defendants John Hill and Nancy Hill, is the only real party in interest. It is a suit in equity to quiet the title of the plaintiffs to a tract of land in Wayne county, Ky., in this district, containing 1,138 acres as against the claim of the defendant Pinkie Kidd. The bill alleges that the plaintiffs are the owners and in the actual possession of that tract. They claim title thereto under a deed therefor from F. N. Alexander and wife, dated November 1, 1903, lodged for record in the Wayne county court clerk's

office January 12, 1904. The claim of the defendant Pinkie Kidd does not pertain to the whole of the tract. It pertains only to so much thereof as is covered by certain patents which emanated from the commonwealth of Kentucky to the plaintiff's grantor, F. N. Alexander, in the years 1880 and 1881, and as to so much thereof only as conflicts with a senior patent which emanated to one J. W. Mills on the 13th day of July, 1858, between whom and the defendant Pinkie Kidd there is a regular concatenation of title deeds.

The main controversy in the case relates to the location of the Mills patent. The defendant claims that it covers more land than the plaintiffs are willing to concede. I am not sure that plaintiffs concede that the patent can be located so as to cover any of their land. It is certain that they deny that it can be so located as to cover all that the defendant claims that it covers, which is much more than will be covered as plaintiffs view the matter by any possible location. It is also in issue in the case whether plaintiffs were in actual possession of the land in controversy at the time the suit was brought, a fact essential to the maintenance thereof, and also, whether at the time of the making of the deed from Alexander and wife to plaintiffs, under which plaintiffs claim, the defendant was in the actual adverse possession of the land in controversy, so as to render that deed champertous and without effect in passing title thereto to the plaintiffs. But for the present at least I pass these minor issues by and proceed at once to a consideration of the main controversy.

The Mills patent states that the boundary of land covered by it contains 100 acres. According to plaintiffs' claim as to the true location thereof, it contains 600 or 700 acres. It is located on the west side of the South fork of the Cumberland river. At the time of its emanation the patentee owned on the same side of that river, but some distance away, a tract of land containing 250 acres conveyed to him by Robert Parmley, to whom same had been patented. The boundary of the Mills patent consists of 13 lines and 13 corners. The course and distance of each line except the last is given. The corners called for are all stake corners except the first and last. The first corner called for is a poplar and the last a pine. The first corner is not otherwise identified. The pine corner is said to be "J. W. Mills corner," which defendant claims is the northwest corner of the Parmley patent, then owned by Mills. Six of the stake corners are located otherwise than by the courses and distances there cornering. Three of them, the second, the sixth, and ninth, are said to be "at the river cliff"—i. e. the cliff of the South fork of Cumberland river—two of them, the tenth and eleventh, are said to be "on" and "in" "Thomas Ryan's line," the tenth line running from the one to the other, and, in addition to having its course and distance given, is said to run with Ryan's line, and one, the twelfth, is said to be "on Isaac Foster's line." It will be noted that it is not stated whereabouts at the river cliff or on or in Thomas Ryan's line or on the Isaac Foster line these stakes are said to be located. They are simply said to be at the river cliff or on or in Thomas Ryan's line or on Isaac Foster's line.

There is a controversy as to the location of the first or poplar corner of the patent boundary. According to the defendant, it is located about 250 yards from the northeast corner of the Robert Parmley 250-acre patent. It is not now standing, having been cut down to make a coffin out of it, but its stump is still there. The patent boundary can be made to close by locating it according to the courses and distances called for as to the first 12 lines, and then connecting the thirteenth or last corner with the beginning corner by a line drawn between them. But in so doing it will never come near the cliff of the South fork of the Cumberland river at any point, or near any Thomas Ryan or Isaac Foster boundary or touch the Robert Parmley 250-acre patent boundary.

According to defendant's claim, the boundary should be located in this way. Beginning at the poplar, termed the "coffin poplar," to distinguish it from another poplar indicated by some of the evidence as the true corner, and running the first line, the course called for, but extending it from 200 poles, called for, to 410 or 414 poles, takes one to the river cliff; the point where it strikes same being the second stake corner called for as located at the river cliff. Then running the second, third, and fourth lines according to the courses and distances called for and the fifth line according to the course called for, but extending it from 60 poles called for to 86 poles, takes one again to the river cliff; the point where it strikes the same being the sixth stake corner called for as located at the river cliff. Then, running the sixth and seventh lines according to the courses and distances called for and the eighth line, neither according to course or distance, but north 90 poles, instead of south 45° west 20 poles, called for, takes one again to the river cliff; the point where it strikes the same being the ninth stake corner called for as located at the river cliff. Then running the ninth line the course called for, but extending it from 60 poles, called for, to 150 poles, takes one to the line of a 50-acre Thomas Ryan survey, located on the west side of the South fork and binding on it; the point where it strikes that survey being the tenth stake corner called for as located on Thomas Ryan's line. Then, running the tenth line with that line of the Ryan survey, the distance called for, not the course called for, north 85° west, but north 19° west, the course of the Ryan line, takes one to another point in that line, being the eleventh stake corner called for as located in Thomas Ryan's line. Then running the eleventh line the course called for, but extending it from 40 poles called for to 300 poles, takes one to the line of an Isaac Foster survey of 200 acres; the point where it strikes that survey being the twelfth stake corner called for as located on Isaac Foster's line. Then running the twelfth line neither according to course or distance called for—i. e., south 33° east 150 poles—but south 8° east 270 poles, takes one to the northwest corner of the Robert Parmley 250-acre survey owned by the patentee Mills at the time of the making of survey in question, in which three pines are called for; that corner being the thirteenth corner called for as "J. W. Mills corner, a pine." Then running with the northern line of the Robert Parmley 250-acre survey, called

for in the patent as "J. W. Mills. Old ——— Line," to the northeast corner of that survey where three Spanish oaks, now gone, once stood, and on past it to the beginning. This location really gives 14 lines and 14 corners, instead of 13 lines and 13 corners, as called for in the patent. This arises from the fact that the patent boundary calls for one line from the "J. W. Mills corner, a pine," with "Mills old line" to the beginning, when as a matter of fact there are two lines, one from the northwest corner of the Parmley 250-acre survey called for as three pines to the northeast corner called for as three Spanish oaks and the ʹother from the latter corner to the beginning, the two not having the same course. Such, then, is the location called for by the patent according to the defendant's claim. It must be conceded that it is considerably away from the calls of the patent. It gives a quantity six or seven times as great as called for; extends the distances of four lines, the first one from 200 poles to 410 or 414 poles, the fifth one from 60 poles to 86 poles, the ninth one from 60 poles to 150 poles, and the eleventh one from 40 poles to 300 poles; changes the course of one line, the tenth one, from north 85° west to north 19° west; changes the courses and distances both of two lines, the eighth one from south 45° west 20 poles to north 90 poles and the twelfth one from south 33° east 150 poles to south ·8° east 270 poles; gives an additional line and corner, thus making the boundary one of 14 lines and 14 corners, instead of 13 lines and 13 corners, and provides a plat which does not much, if at all, resemble that in the certificate of survey on which the patent is based. Yet by such manipulation five lines, three between the first two river cliff corners, the second, third, and fourth, and two between the last two rivers cliff corners, the sixth and seventh, are preserved exactly as called for. three river cliff corners, two corners in a Thomas Ryan line, and a line coinciding with a Thomas Ryan line, one corner in an Isaac Foster line called for are provided; and the boundary is connected with the Robert Parmley 250-acre survey then owned by Mills at its northern boundary.

As already intimated, I am not sure that I have caught the plaintiffs' position as to the location of the patent. Possibly they contend it is nonlocatable, or, in other words, that its location is so uncertain as to be void. Possibly they contend that the coffin poplar is not the beginning corner, and that of the two poplars referred to in the evidence the other poplar should be accepted and the patent located with it as the beginning corner. Possibly they contend that whichever poplar is accepted as the beginning corner it should be located according to courses and distances called for, without any reference to the calls for the river cliff, Thomas Ryan's line, Isaac Foster's line, and the J. W. Mills corner, a pine or Mills old line, connecting the thirteenth corner with the beginning corner by a line drawn between them. Possibly they contend that, according to the location claimed by defendant, the patent boundary will not reach the river cliff, Thomas Ryan's line, Isaac Foster's line, J. W. Mills' corner. a pine and Mills old line. The plaintiff's surveyor so testifies. According to him, extending the first line from the beginning corner along its course from

196 F.—58

200 poles called for to 410 or 414 poles will not reach the river cliff. To reach the river cliff, it will have to be extended to 585 poles. So extending, it is not possible with the courses and distances given according to defendant's location to reach the other calls for the river cliff, for Thomas Ryan's line, for Isaac Foster's line, and for the J. W. Mills corner a pine and Mills old line. Or possibly they contend that the patent should be located extending the first line from the beginning corner from 200 poles to 585 poles so as to reach the river cliff, then running the second, third, fourth, and fifth lines so as to reach the river cliff again as a sixth corner, and the sixth, seventh, and eighth lines, so as to reach the river cliff again as a ninth corner, and then connecting the ninth corner by certain lines with the Robert Parmley 250-acre survey without making any effort to connect with the Thomas Ryan or Isaac Foster surveys, which should not be accepted as the surveys called for in the patent, all as indicated in the testimony of plaintiff's surveyor, but which I find some difficulty in comprehending. I have an idea that this is the position upon which more than any other plaintiffs rely.

Before taking position as to whether the patent is locatable and what is its true location, it should be noted that defendant claims that by a judgment of the circuit court of Wayne county rendered at its January term, 1907, affirmed by the Court of Appeals of Kentucky on the 28th day of February, 1908, in certain litigation pending therein, the patent in question here has already been located in accordance with her contention, and that the plaintiffs are estopped by reason thereof from claiming that such is not the true location. That the patent has been so located is the fact; the opinion of the Court of Appeals on its affirmance of the judgment of the Wayne Circuit Court being reported as Alexander v. Hill (Ky.) 108 S. W. 225.

The defendant Pinkie Kidd, then Pinkie Hill, was the plaintiff in that litigation. It was begun 11th day of January, 1904. The deed from Alexander to plaintiffs had then been made, but it was not lodged for record until January 12, 1904, the day after the suit was brought. She did not then know of the making of that deed, and did not learn of it until after the termination of that litigation. She had been told that a deed had been made by Alexander to one J. W. Rowe, but, on examining the records, had found no such deed. The suit was brought by her to quiet her title as against the Alexander claim. In her petition she claimed the patent to be located as claimed herein and as was subsequently adjudged therein, and that she was in the actual possession of the land covered by it as thus located. She made defendants thereto F. N. Alexander, plaintiff's grantor, whom the record showed to be still the owner of the Alexander claim, and J. W. Rowe, to whom she had been told a deed therefor had been made. Neither of the plaintiffs were parties of record, unless it can be said that J. W. Rowe should be taken as plaintiff I. W. Rowe. The action was defended by Alexander. He did so in the name of himself and J. W. Rowe. The answer was in their joint names, and all steps were so taken and the judgment went against both.

In the deed from Alexander to plaintiffs he had given a general

warranty which bound him to indemnify plaintiffs against the defendant's claim. They had heard of the existence of her claim prior to and at the time of their purchase and the purchase was made in view of it. They possibly did not understand that it was as large a claim as it turned out to be or that it was held by defendant, or that it might be asserted in a suit thereafter to be brought. Apparently all that they had been informed about it was that it covered 83 or 86 acres, that it was held by her adopted father, John Hill, and that it was involved in a suit then pending in the circuit court of Wayne county brought by her grantor against John Hill and others to recover damages for cutting down a small number of trees standing thereon and which subsequently resulted in his favor. I do not think there can be any question that the understanding between plaintiffs and their grantor, Alexander, was that he was to defend the land covered by their purchase against that claim as under his covenant of warranty he was bound to do so. It was in pursuance to this understanding that their grantor, Alexander, when the defendant brought her suit in the Wayne circuit court on January 11, 1904, the day before the deed was put to record asserting her claims against him, and J. W. Rowe, took charge of the defense of the suit, and controlled and managed it, and bore its expense until its termination. Nor have I any doubt of the fact that plaintiffs knew of the pendency of this suit, and that their grantor was defending it, and that they were relying on his defending it pursuant to his understanding with them and in accordance with his covenant of warranty. They so knew and relied through their attorney, who was on the ground, and had "full authority" to "look after the land" if not otherwise. In so doing, therefore, their grantor, Alexander, was acting on their behalf as well as of himself, and they are bound and concluded by the judgment therein. It is not open to them now that that litigation has resulted in favor of defendant to come into this court and seek to reopen it. Mr. Greenleaf says:

"Justice requires that every cause be once fairly and impartially tried, but the public tranquillity demands that, having been once so tried, all litigation of that question and between the same parties should be closed forever. It is also a most obvious principle of justice that no man ought to be bound by proceedings to which he is a stranger; but the converse of this rule is equally true, that by proceedings to which he was not a stranger he may well be bound. Under the term 'parties' in this connection, the law includes all who are directly interested in the subject-matter, and had a right to make defense or to control the proceedings and to appeal from the judgment. This right involves also the right to adduce testimony and to cross-examine the witnesses adduced on the other side. Persons not having these rights are strangers to the cause. But to give full effect to the principle by which parties are held bound by a judgment, all persons who are represented by the parties, and claim under them, or in privity with them, are equally concluded by the same proceedings. The ground, therefore, upon which persons standing in this relation to the litigating party are bound by the proceedings to which he was a party, is that they are identified with him in interest; and, wherever this indentity is found to exist, all are concluded alike." 1 Greenleaf, Ev. §§ 522, 523.

It is urged that the judgment rendered in the tresspass suit in the Wayne circuit court brought by plaintiffs' grantor against defend-

ant's adopted father, John Hill, in favor of the plaintiff therein, is res adjudicata as against the defendant. I do not think that it is, but, if it were, that defense might have been asserted in the subsequent suit brought by defendant against plaintiffs' grantor and J. W. Rowe in that court, and the judgment therein is res adjudicata, not only as to what was actually decided therein, but as to all defenses which might have been made therein.

The judgment, therefore, of the Wayne circuit court in that suit, affirmed by the Court of Appeals, is an estoppel against the plaintiffs claiming herein that the true location of the patent in controversy is not as adjudged therein.

Were this not the case, and the true location of the patent an open question before me, I do not think I would be justified in deciding the matter differently from the state courts. It is true that some additional evidence has been introduced herein, but I do not think that it is of such consequence as to warrant my going that far.

The bill is dismissed, at plaintiffs' costs.