ROWE et al. v. KIDD et al.

(District Court, E. D. Kentucky. September 14, 1916.)

1. COURTS ⊙⟹367—FEDERAL COURTS—PRECEDENTS.
   A decision of the highest state court relating to title to land is a binding precedent in subsequent litigation in the federal court, in so far as the principles of law upon which the original decision was based have become rules of property in the state, and the application of such principles should be deemed prima facie correct, this being so though plaintiffs, because not parties, were not bound by the decision, and it was not officially reported.

2. BOUNDARIES ⊙⟹3(8)—LOCATION—CALLS FOR QUANTITY OF LAND—PLAT.
   The calls for quantity in a survey as well as the plat are merely evidentiary as to the true location, the plat being of greater force than the calls for quantity.

3. BOUNDARIES ⊙⟹54(1)—DESCRIPTION—UNCERTAINTY.
   A survey of lands which described one of the lines as running to a stake on the line of another parcel is not invalid for indefiniteness of the survey, even though there were several parcels which fitted the description of the one referred to, but it must be ascertained from all the circumstances which parcel was intended.

4. BOUNDARIES ⊙⟹3(6)—LOCATION—CERTIFICATE.
   In determining the location of an actual survey, the fundamental principle is that it should be located where the surveyor ran it, and, in case of conflict between the survey as actually made and the surveyor's certificate, the former controls.

5. BOUNDARIES ⊙⟹3(3, 5)—CALLS—COURSES AND DISTANCES—MONUMENT—"IDEAL LINE."
   A call for a fixed and ascertainable monument will, where the survey was actually run, control a call for courses and distances, and for the same reason a call for an ideal line, that is, one which is not actual or marked, as the unmarked boundary line of another survey, is inferior to a call for courses and distances, as the surveyor might well have been

---

⊙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

mistaken as to the location of the ideal line, though being correct as to the distance.

6. BOUNDARIES ⬳3(6)—CALLS—COURSES AND DISTANCES.

Where a survey was merely protracted, that is, the lines projected without being actually run upon the ground, a call for an ideal line, though it is an invisible line, will control a call for courses and distances, where the ideal line, by reason of recordation of other instruments, is susceptible of definite location, the whole matter resting in the mind of the surveyor.

7. BOUNDARIES ⬳54(1)—SURVEYS—NATURE.

That there are two things which answer to a call of a survey, and it cannot be determined definitely which is the one called for, does not invalidate the survey, the rule being that the one which is most against the survey is to be taken.

8. BOUNDARIES ⬳37(1)—RELOCATION OF SURVEY—EVIDENCE.

In a suit to quiet title, evidence *held* to show that defendants were entitled to the property in controversy, and that the relocation of the older survey under which they claimed, whereby such land was included, was substantially correct.

In Equity. Suit by J. W. Rowe and Hannah Rowe against Pinkie Kidd and others. Bill dismissed.

H. C. Gillis and B. B. Snyder, both of Williamsburg, Ky., for plaintiffs.

O. H. Waddle & Son, of Somerset, Ky., for defendants.

COCHRAN, District Judge. This cause is before me for final decree. It was before me once before therefor, and I dismissed the bill. My opinion then delivered is reported in Rowe v. Hill (D. C.) 196 Fed. 910. On appeal this judgment was reversed. The opinion of the Appellate Court is reported in 215 Fed. 518, 132 C. C. A. 30. That court, however, did not direct what judgment should be entered. It merely directed that the case should be reopened and heard again. This has been done, and it is upon such rehearing that it is now before me.

On the former hearing I held that the questions as to the validity and location of the patent to J. W. Mills, of date July 13, 1858, upon a survey made January 4, 1858, for 100 acres of land in Wayne county, Ky., in this district, involved herein, were res adjudicata, because of the judgment of the Wayne circuit court, affirmed by the Court of Appeals of Kentucky in the case of Alexander v. Hill (Ky.) 108 S. W. 225, and that if they were not, that I would not be justified in deciding the matter differently from the state courts. On the question of res adjudicata I thus expressed myself:

"I do not think there can be any question that the understanding between plaintiffs and their grantor, Alexander, was that he was to defend the land covered by their purchase against that claim as under his covenant of warranty he was bound to do so. It was in pursuance to this understanding that their grantor, Alexander, when the defendant brought her suit in the Wayne circuit court on January 11, 1904, the day before the deed was put to record, asserting her claims against him and J. W. Rowe, took charge of the defense of the suit and controlled and managed it and bore its expense until its determination. Nor have I any doubt of the fact that plaintiffs knew of the pendency of this suit, and that their grantor was defending it, and that they

were relying on his defending it pursuant to his understanding with them and in accordance with his covenant of warranty. They so knew and relied, through their attorney, who was on the ground and had full authority to look after the land, if not otherwise. In so doing, therefore, their grantor, Alexander, was acting on their behalf as well as of himself, and they are bound and concluded by the judgment therein. It is not open to them, now that that litigation has resulted in favor of defendant, to come into court and seek to reopen it."

This position was held to be erroneous by the Appellate Court. Judge Sanford, who delivered its opinion, said:

"Nor are they bound by said judgment, even if, as found by the court below, the defense made by Alexander to the suit was made both for himself and them, in pursuance of an understanding and agreement with them, since, whatever may have been Alexander's action in that regard, it was not open and known to the other party; and the estoppel arising by reason of assuming the defense of a suit must, as in other cases, be mutual."

The cases cited in support of this statement were cases where persons not parties to the suits defended them for the parties defendant, but unknown to the plaintiffs. He further said:

"It is true that if the plaintiffs knew of the pendency of said suit, and either through the agency of Alexander or by attorney actually participated in its defense in the name and under the guise of 'J. W. Rowe,' and through such representative filed the answer in such name, in which it was admitted that Alexander had made a conveyance to such 'J. W. Rowe,' thereby misleading the defendant as to the name and identity of the purchaser, and causing her to fruitlessly pursue her litigation against such fictitious vendee, they would now, in our opinion, be estopped from denying their identity with 'J. W. Rowe' as Alexander's vendee, and would, by reason of such estoppel be bound by the judgment rendered aganst 'J. W. Rowe' in the former suit, as if they had actually been parties. However, while the circumstances are such as to create a suspicion that the facts were as above suggested, yet, after careful consideration of the meager evidence in the record, especially in default of the testimony of either of the attorneys who represented 'Alexander and Rowe' in the former suit, one of whom apparently died before proof was taken, we are constrained to conclude that the evidence is sufficient to create such suspicion and not substantial enough to establish the fact."

It is to be noted, in this connection, that it is not said that if plaintiffs knew of the pendency of the suit, and that the defendant Pinkie Kidd, plaintiff therein, had brought before the court "J. W. Rowe" as Alexander's vendee, and that the answer filed in the name of Alexander and Rowe expressly admitted that he was such and with such knowledge kept silent, plaintiffs are estopped to deny their identity with "J. W. Rowe," and hence bound by the judgment rendered against "J. W. Rowe." As the matter is put, in order to this it is essential also that plaintiffs actually participated in the defense of the suit in the name and under the guise of "J. W. Rowe," through the agency of Alexander or by attorney, and through such representative filed the answers. It is clear that they did not so participate. But it is equally clear that they had such knowledge, and with it they took no steps to correct the error, but kept silent in regard thereto. Under the evidence, as it now stands, I think I was in error on my former hearing in holding that Alexander defended the suit pursuant to any understanding with plaintiffs. It is quite likely that there never was

any understanding between them as to Alexander's defending any suit in relation to the land.

At the time of plaintiffs' purchase the trespass suit of Alexander against Hill was pending, and the deferring of the payment of part of the purchase money may have been to await the outcome of that suit, and, upon its being determined in Alexander's favor in the December preceding the bringing of the suit by the defendants, the rest of the purchase price was paid, except perhaps for 83 acres, covered by the Mills patent, located according to courses and distances. The defense of the suit by Alexander was because he had warranted the title to the plaintiffs and was bound to defend it. That plaintiffs had such knowledge I think was the reasonable inference from the evidence as it stood on the former hearing and not a mere matter of suspicion. The plaintiff I. W. Rowe admitted that he had heard by letter from his attorney, Mr. Johnson, of the pendency of the suit. Mr. Johnson, therefore, must have known of its pendency. He could not otherwise have written plaintiff I. W. Rowe about it. As soon as he heard of it, as plaintiffs had relied on him in making the purchase, naturally he would at once take steps to ascertain exactly its character. And in determining the truth of things one has the right to take into consideration the way men act. It was convenient for him to find this out, as the suit was pending in an adjoining county, whose courts, no doubt, he attended. The inference that he did so was strengthened by the facts that his letter or letters conveying the information as to the pendency of the suit were not produced, and that Mr. Johnson did not testify as to what he knew concerning the matter. That he was then acting as plaintiffs' attorney in relation to the land was testified to by the plaintiff I. W. Rowe in his testimony. But, however this may be, such knowledge was proven directly on the present hearing by the testimony of Mr. Bertram and Mr. Sharp, who were Mr. Alexander's attorneys in the suit, and Mr. Snyder, Mr. Johnson's partner, he having died since the former hearing. Mr. Bertram testified that shortly after the suit was brought Mr. Johnson was in Monticello, the county seat of Wayne, and had a conversation with him about it, and how it was brought and the parties against whom it was instituted. Upon his (Bertram's) making some suggestion to Johnson about filing the answer or about the answer which had been filed, he then said that the suit had not been filed against his client, and that he knew nothing about J. W. Rowe, and that he would have nothing to do with defending the action. Mr. Snyder testified that Mr. Johnson in his letter to plaintiff I. W. Rowe told him that J. W. Rowe was a party defendant. The situation was not relieved by the request made of Mr. Sharp to have the answer withdrawn and his promise to do so. It was never withdrawn and no pains were taken to see whether the request had been complied with.

Furthermore, I am inclined to think that the Appellate Court, on further reflection, would hold that, in order to constitute the estoppel and bind plaintiffs by the judgment, it was not essential that they should have actually participated in the defense of the suit, but that such knowledge and silence on their part alone was sufficient to that

end.    In the first statement quoted from Judge Sanford's opinion it was held that the judgment was not res adjudicata by reason of the fact that Alexander defended the suit pursuant to an understanding between him and plaintiffs, and, as heretofore stated, the decisions cited in support of this position were cases where persons not parties to the suit had actually participated in its defense without plaintiff's knowledge.    And the typical instance of estoppel in pais is not where a party acts, but where he keeps silent when he should have spoken. It is hardly open to question that plaintiffs' conduct in allowing the defendant to proceed under the misapprehension upon which she was proceeding, and to be misled as she was by the answer, was inequitable.    So that if this is sufficient to work an estoppel it is an end of the case, as there can be no question as to the facts.

But I do not feel justified in acting upon the idea that the Appellate Court would so hold.    It included actual participation in the defense of the suit as a part of the estoppel, and it would rather be in the face of its decision for me to hold that it is not essential to the estoppel. Hence will I dispose of the case on the basis that the Appellate Court would not so hold.

[1] The decision, however, is binding as the Appellate Court recognized, in so far as the principles of law upon which it was based have become a rule of property in this state.

What, then, is the proper attitude to take towards the decision of the Court of Appeals in Alexander v. Hill?    Thus far I have reached the conclusion not to treat it as binding save to the extent just stated. Should I go to the other extreme and treat it as if it had never been rendered?    Judge Sanford said that, "regardless of its binding effect, we would with great reluctance feel ourselves constrained to differ from the highest tribunal of the state in a decision affecting title to real estate within its borders."    This was said without reference to the fact that plaintiffs had knowledge of the pendency of that suit and of its character, and with such knowledge kept silent, which has now been made to clearly appear.    This circumstance certainly should have the effect, if no more, of adding to the reluctance to depart from that decision.    And another circumstance has transpired since the decision of the Appellate Court herein which adds thereto.    That is that the Court of Appeals in the reported case of Rock Creek Property Co. v. Hill, 162 Ky. 324, 172 S. W. 671, which involved the location of a patent covering lands in Wayne county, and probably in the same general neighborhood as those covered by the patent involved here, and presented questions somewhat similar to those presented in Alexander v. Hill, cited with approval its decision in that case.

In this connection it may not be amiss for me to refer to a circumstance which affected me in handling it on the former hearing.    I had theretofore refused to follow a decision of the Court of Appeals of Kentucky locating a patent.    It was the case of Davis v. Commonwealth L. & L. Co. (C. C.) 141 Fed. 711, cited and relied on by plaintiffs.    There, however, the Court of Appeals had been imposed on, by a trick as it were.    There was no real controversy before it.    The controversy before it was a sham one.    And the party, for the pur-

pose of affecting whom it was brought about, never heard of it until after the decision had become final. The details which make this certain are referred to on pages 714 and 715 (141 Fed.) of my opinion. Being convinced that the decision of the Court of Appeals was wrong I refused to follow it, and followed, with a certain modification, the previous decisions of Judges Barr and Evans in the predecessor of this court, reported in Davis v. Farmer (D. C.) 141 Fed. 703, and Davis' Heirs v. Hinckley (C. C.) 141 Fed. 708, in the correctness of which some of the best lawyers in the state had acquiesced. On appeal to the Sixth Circuit Court of Appeals for this circuit my decision was reversed, and that of the Court of Appeals followed. Bramblet v. Davis, 141 Fed. 776, 72 C. C. A. 204. It held that I was right in the modification of the opinion of Judges Barr and Evans; but that we were all wrong in holding that it was the thought of the certificate of survey that the third line of the boundary ran with the top or crest of Cumberland mountain. It, as had the Court of Appeals, took it that this line so ran, not, however, because such was the thought of the certificate of survey, but of necessity. It could not run otherwise. The Court of Appeals had not considered what was its thought as to this matter at all. When confronted with the fact that the course and distance called for did not so run, but across Virginia into Tennessee, several miles south of Cumberland Gap, it did not take up the problem presented as to what was the thought of the certificate of survey as to where the line ran, and attempt to solve it, but reversed the lines from the beginning corner, and accepted so much of the top or crest of the mountain as lay between the fourth corner thus found and the third corner as the third line. The Appellate Court of this circuit did consider the problem, and held that the thought of the certificate of survey was that the third line ran according to course and distance called for, and not with the top or crest of Cumberland mountain; but as Kentucky had no right to grant land in Virginia or Tennessee, the third line had to be limited to such top or crest, the length of which was the same as that found by the Court of Appeals. As, then, necessity fixed that as the third line, it also fixed its length. But if the thought of the certificate of survey was that the third line so ran, as we held, its thought also determined the length which was the distance called for. As a rule I have not questioned the correctness of decisions of the Appellate Court reversing my judgments or decrees. I have been made to realize that for some reason or other—possibly for want of due deliberation—the truth has escaped me. But occasionally I have been unconvinced, and this is one of those cases. There can be no question that the Appellate Court was largely influenced in taking the position which it did by that of the Court of Appeals. Concerning it Judge Richards, without indicating any sensitiveness to the manner in which the decision of the Court of Appeals had been obtained or feeling that its value was thereby affected, thus expressed himself in regard thereto:

"Under the circumstances, we must hold that whether the location of the Ledford patent involved in Creech v. Johnson ought to have been heard and adjudicated was one for the Court of Appeals to pass upon, and, since it entertained jurisdiction and delivered a considered opinion, which appears in

the reports of the court prepared for publication, we must accept its conclusions as its deliberate judgment upon the location of the patent, entitled to the weight such judgments usually are."

When then this case came before me on the former hearing, and I was confronted with a decision of the Court of Appeals determining the validity of the patent involved here and locating its boundary as contended for by defendant, I could not help but feel that, if I could not safely refuse to follow a decision of the Court of Appeals obtained as that had been, I could not safely refuse to follow the one involved here obtained as it had been. Here the trick, if any there was, was on the other side, consisting in keeping silent with the view of claiming the benefit of the decision if favorable and disowning it if unfavorable. The fact that this decision had not been officially reported and that one had would make no difference. The not officially reporting a decision of the Court of Appeals affected its importance rather than its value. Hence it was that I did not have sufficient patience with the case on the former hearing, and did not give it the consideration which I would otherwise have done. I refrained from going deeply into the validity of the patent and placed the estoppel on a wrong basis.

Returning then from this digression, I may say that I do not think that I should treat that decision as if it had never been rendered, but accept it as at least prima facie correct, not only as to the principles of law therein applied, but also as to the application of them, and refuse to depart therefrom unless it is made clearly—I might say, but will not, beyond a reasonable doubt—to appear that the Court of Appeals was in error in one or the other of these particulars.

The Court of Appeals upheld Stanfill's location of the patent. The question then comes to this: Accepting that location as prima facie correct, is it made clearly to appear that it was incorrect?

[2] At the outset some considerations calculated to prejudice one against that location should be placed in their proper light. One is that according thereto the quantity of land covered by the patent is greatly in excess of that called for thereby. The patent calls for 100 acres. That location covers about 650 acres. Another is that the location departs radically from the plat, which accompanied the certificate of survey, at its northwestern end. Now the quantity called for and the plat are merely evidential, the latter more than the former, as to the true location. They are not controlling. In the case of Rock Creek Property Company v. Hill, supra, the patent called for 150 acres. The location thereof which was adopted covered 500 or 600 acres. And it is stated in the opinion that the location differed "materially" from the plat. It is possible, therefore, for the circumstances to be so strong in favor of the Stanfill location that it must be accepted notwithstanding it is in the face of the call for quantity and of the plat.

Another such consideration is that the Stanfill location necessitates so many mistakes in the original survey in the courses and distances called for. On the basis of its correctness in four of the lines—the first, eighth, tenth, and twelfth—mistake was made in both the course

and distance called for; and in three of them—the fifth, ninth, and eleventh—mistake was made in the distance called for. The mistake in each of these seven lines as to distance was in making it too little. In the Rock Creek Property Company v. Hill case it appeared that the surveyor who made the original survey, which was made in 1859, i. e., almost simultaneously with the making of the one involved here, purposely, and in order to conceal the acreage, cut down the distances in his certificate. Of the twelve lines then, for which courses and distances were given, only five—second, third, fourth, sixth, and seventh—were correct as to both. But it is to be noted that as to eight out of the twelve lines the call for course was correct, and as to the four in which there was a mistake as to course, in the case of one, to wit, the first, the mistake was very slight. It is to be noted, further, in each of the cases where there was a mistake as to the course and distance, or as to the distance alone, a change was required in order to reach or go with a thing called for in the certificate. The first, fifth, and eighth lines called to go to a stake at the river cliff, the ninth to a stake on Thomas Ryan's line, the tenth with that line to a stake on it, the eleventh to a stake on Isaac Foster line, and the twelfth to J. W. Mill's corner, a pine. Mistakes in giving the course and distance called for are not fatal. They are common occurrences in surveys in this state. And, as it is agreed in this case, no actual survey was made, nothing being done but to establish the beginning corner, it was to be expected that a mistake would be made in each of the lines calling to go to or with a thing. It would have been marvelous had the surveyor hit any one of the lines exactly. Still another such consideration is that the Stanfill location adds another line, to wit, the closing line from the beginning or northeast corner of the Parmley survey to the beginning corner, making the survey one of fourteen lines instead of thirteen lines. This line is but slightly out of line with the northwest or first line of that survey then owned by Mills. It may easily have been taken to be in line therewith, and the last call, with "Mills' old line to the beginning," does not necessarily mean that it continues with that line clear to the beginning. And it is to be noted that the course and distance of that line is not given.

I now proceed to take up the errors which it is claimed Stanfill made in making his location and to determine the effect thereof. There are two important particulars in which it is conceded by plaintiffs that he did not make any error which should be noted first. One is as to the location of the Thomas Ryan survey, to the fifth or closing line of which he ran the ninth line, and with which he ran the tenth line, and of such closing line. And the other is as to the location of the Isaac Foster survey, to the eleventh line of which he ran the eleventh line, and of such line of that survey. Those two surveys and those lines are well known and established. Alexander, under whom plaintiffs claim, ran to and called for them in his surveys. And it is true to say that these matters were well known and established when the Mills survey, here in question, was made. This is a fact that has never been disputed in this case, but always frankly conceded. It was because of this that no pains were taken on the former hearing to introduce the certificate of survey and patents in evidence.

The particulars in which it is claimed that Stanfill erred are quite numerous. They,.and what I have to say as to them, are as follows, to wit:

1. That in running the second line he ran it a due north course as called for in the patent, and not N., 40 E., as called for in the certificate of survey. And defendant concedes that he did so err. The fact is that counsel and not Stanfill have erred here. When asked on direct examination as to whether he ran with the patent or the certificate of survey in running the second line, Stanfill's answer was that he did not recollect. This was all he said as to this on the present hearing. Though his testimony on the former hearing was not introduced on this, plaintiff relies entirely on what he said then in support of the claim that he so erred. On that hearing, on direct examination, his attention was called to the fact that the second call of the patent was N. 40 poles to a stake, and he was asked whereabouts he fixed that corner. His answer was at letter "C" on his map. He was then asked as to whether he extended the number of poles, and his answer was, "We simply run it on the degree and the number of poles called for"; neither counsel asking the question, nor did Stanfill have his attention directed to the fact, that the patent here did not conform to the certificate of survey, the latter of which two documents governs. It was assumed that the patent call conformed to the survey, and hence was correct, just as in the judgment of Alexander v. Hill the patent, and not the certificate, was followed. That Stanfill followed the latter, and not the former, is shown by his map, as was recognized by Mr. Blakeman in his testimony on the former hearing, which may be referred to if Stanfill's is to be considered. He testified that a map which he had made of the boundary given in the judgment in Alexander v. Hill did not conform to the Stanfill map in two particulars, one of which was in the course of the second line, there being a mistake in that line, in that the judgment followed the patent and not the certificate. And Kinnie testified that there was a stake at the Stanfill rock with pointers N., 40 E.

2. That he allowed no variation in the magnetic needle from the true meridian between the time of the original survey and that made by him and that he made his survey by surface not by horizontal measurement. It would seem that his measurement was as claimed. As to making allowance for variation, if we confine ourselves to the evidence on this hearing, as it would seem we are bound to do, it is not made absolutely certain that he did not make allowance. The evidence as to whether he made allowance for variation is confined to the first line. As to whether he failed to make such allowance there, depends on whether he first determined the point to which he ran as the river cliff to be the point called for, and then ran from the beginning corner to it, or whether he found that point and was led to fix on it as the point called for by running the course called for from the beginning corner. If the latter, then he failed to make such allowance, for it is shown that the line run making such allowance will run to the right or south of such point some little distance; if the former, then he did not so fail. There was in that case no occasion for making such allowance, as there was nothing to be done but run a line from the be-

ginning corner to such point, and take it for whatever it might be. In certain particulars he did determine the location of things called for before he began to survey the boundary in question. He so determined as to the Ryan, Foster, and Parmley surveys. It was not developed, as I recall the evidence, as to how he came to fix on the point to which he ran the first line as the point called for in the certificate. And in his testimony on this hearing he did not give it as his recollection that he failed to make such allowance here. It was a mere matter of belief and judgment that he so failed. This belief and judgment may have arisen from the evidence that the line, run with the proper allowance, would not strike the point which he fixed on as that called for. But it did not follow from this that he had erred in not making such allowance. If he had first determined on such point as that called for, there was no occasion to make any allowance, and the error made, if any was made, was in fixing on that point as that called for. Had he been asked the basis of his belief and judgment, and how it was he came to fix on that point as the point called for, something might have been elicited indicating more definitely whether he made any error in running this line, and, if so, whether it was in not making the proper allowance for variation or in fixing on such point as the point called for.

But conceding that he erred in not allowing for such variation as well as in the manner of his measurement, what follows? If the defendant were here seeking for the first time a location of its boundary and a judgment against plaintiff as to the land covered thereby, the court should, no doubt, refuse to uphold the location, and might require a location to be made with the proper allowance and measurement, with a view, if such location could be made, of upholding it. Such, however, is not the case. Plaintiffs are here seeking a judgment that the land covered by Stanfill's location belongs to them, and that under the circumstances under which plaintiffs appear here, as heretofore stated. It would seem that the court should not grant relief on this ground unless it is made to appear that a location cannot be made with proper allowance and measurement, or that, if it can, a location so made will cover less ground than Stanfill's location, and then only as to the excess. Neither one of these things has been made to appear.

3. That the "coffin poplar" is not the beginning corner. It is not necessary to consider the evidence bearing on this point. The Court of Appeals of Kentucky held that it was. No new evidence has been introduced here; and the Appellate Court, speaking through Judge Sanford, said:

"The location of the poplar beginning corner is, we think, established by the preponderance of the evidence in accordance with the defendant's contention."

4. That the points which Stanfill fixed as the points on the river cliff called for as being reached by the first, fifth, and eighth lines were either not points on the river cliff at all, or, if so, not the points so called for. The Appellate Court seems to have been impressed with the idea that Stanfill had fallen down in his location of the points on the river cliff called for as being reached on the fifth and eighth lines

more than anywhere else. Judge Sanford said that the court was satisfied that Stanfill's map was "incorrect in substantial respects, especially in reference to the location of the river cliffs and their proximity to the Ryan tract." It was the river cliffs called for as being reached by those two lines that were in proximity to the Ryan tract. The one called for as being reached by the first line cannot be said to be in proximity to that tract. There is no other specification of a particular in which that map was incorrect in a substantial respect. As to the river cliff called for as being reached by the first line, plaintiff's claim that the point which Stanfill fixed as that so called for is not the river cliff. They urge that it is no more the river cliff than either of five branch cliffs crossed by the first line before it reaches that point. It is hard to have patience with this position. There is no possible room to compare these branch cliffs with this cliff. This cliff is at right angles to the branch and the water in the branch pours over it. It fronts the river, and though the cliff itself is 25 or 30 feet, possibly as much as 50 or 60 feet, high, the top of it is 500 feet above the river. Whereas, so far as the cliffs on either side of the branch from the cliff over which the branch flows are concerned, they have been made by the erosion of the water pouring over the cliff running parallel with the river, thereby cutting back from the river and making an indentation or cove. In the case of the branch cliffs of which so much is made, the branch runs parallel to them, and they have been made, not by a waterfall, but by the water as it ran in its course. Six different witnesses—Stanfill, Kinnie, Shearer, Swain, Bowermann, and Hays —testified that it was the river cliff. And the testimony of Blakeman, Wilson, Smith, and Neal, so far as it is to the effect that such is not the river cliff, is vitiated by the claim that the branch cliffs referred to are as much river cliffs as that is. Mr. Blakeman, when he surveyed the river cliffs in 1908—the first surveying he did—surveyed it as a part of the river cliff. He testified that, after meandering the river from Ryan's spring at the southeastern end of the Ryan tract to a point opposite Alexander's house site, he "ran directly to the figure 75 on the map, which is 'the river cliff' "; that he "then continued northeasterly for a distance, and then southerly along the top of the river cliff"; and that he "continued this meandering of the river cliff around to figure 61 on the map, then across the branch to figure 72, then to 64, then to 71, then to 57, then to 83, and then to figure 2." Figure 57 is the river cliff claimed by Stanfill and where he placed a rock to mark it; and Blakeman's map No. 2 shows it as a part of the river cliff; the only difference between it and the regular river cliff is that it runs around the cove formed by the erosion of the water from the branch pouring over the river cliff.

So far as the river cliff called for as being reached by the fifth and eighth lines are concerned, Stanfill testified that he ran each of these lines to the river cliff. His familiarity with that country was such as to place him in position to form an intelligent judgment as to whether he did in fact run to the river cliff, and he had no motive to run these two lines otherwise than to the river cliff. There is no evidence to the contrary, except Kinnie expressed doubt as to whether what he took to be the river cliff to which Stanfill ran was the river cliff because of its

distance from the river and the river could not be seen from it. Shearer testified that the Stanfill map laid down the river bluff practically or approximately correct, except that it might be a little incorrect as to the Ryan tract. No one has attempted to show by surveying just where the river cliff runs in this vicinity. Sullivan meandered what he calls the river bank. Blakeman indicates on his map where the river cliff runs nearly down to the Ryan tract. In one place in his testimony he says that he meandered the cliff at this point. But this may have been a slip. He gives in detail just what he did on both occasions, when he did any surveying in connection with this litigation. He testified distinctly, as heretofore noted, that on the first occasion he meandered the river only from Ryan's spring up to a point opposite the Alexander house, and then directly from there to 75 on his map, from which point he meandered the cliff up the river. If he ever meandered the cliff from that point down to the Ryan tract, he gave no indication as to when he did it. Stanfill certainly made a mistake as to the course of the river at the southern end of the Ryan tract. He has it bending to the east before it reaches the end thereof. He neither meandered the river nor the river cliff, and it was to be expected that his map might not show them correctly at all points. But if Stanfill did err in what he took to be the river cliff, the river cliff at these two points is in that neighborhood and closer to the river than he has it, and he erred against the survey, as Kinnie points out.

There is, however, room for holding that he did err in running the first line with reference to the river cliff. Not in that he did not run to the river cliff, but in that he did not run to the point thereon called for, which would be where a line run according to the course called for, making proper allowance for variation, would strike the river cliff, which, according to the testimony of Blakeman, was 585 poles from the beginning corner, taking the coffin poplar to be such corner. Possibly the testimony of Kinnie is to the effect that Hodges in so running that line struck the river at a distance of 403 poles. Otherwise Blakeman's testimony that it would not strike it short of 585 poles is uncontradicted. I take it that when a call is for a line to run to a point in an extended thing, it is only in case the line, when run according to the course called for, will not strike the extended thing at any point, that the course should be abandoned and a line run to the nearest point in such thing. If the line run according to the course called for will strike a point in the extended thing, then it is to be so run, though it will add greatly to the distance. Assuming, then, the first line to run as Blakeman has it, the error of Stanfill was against the survey and plaintiffs are not hurt thereby. Plaintiffs state that, taking this to be the first line, the boundary is impossible of location; but no attempt has been made to show that such is the case. On the contrary, it would seem that there would be no difficulty in locating it. In so doing it, the fifth and eighth lines should not be run so as to strike the river cliff from the outside, i. e., on the river side, but from the inside. It is the thought of the certificate of survey that those two lines strike the river cliff from the inside. This would carry the fifth line over to the river cliff on the north side of the big bend in

the river, and between the Thomas Ryan survey and the Alexander house, and of necessity the eighth line would have to go there also, for the ninth and tenth lines call for the Ryan tract and the eleventh for the Foster.

There is nothing, then, whatever in the error which Stanfill made in running the first, fifth, and eighth lines to the river cliff that is of any benefit to the plaintiffs.

[3] 5. That the Thomas Ryan tract, to and with the fifth or closing line of which Stanfill ran the ninth and tenth lines of the survey, was not the Ryan tract called for. Rather the position is that there were three other Ryan tracts in that vicinity, and it cannot be told which it was intended to run to, and hence Stanfill had no right to run to this one. They are the Rice and Ryan tract, the Huling survey, then owned by Ryan, and another Thomas Ryan survey. But there is no sufficient evidence of another Thomas Ryan survey to justify its being considered. All the surveyors who testify on the subject testify that there is no other Thomas Ryan survey than the one to which Stanfill ran. A Rice and Ryan tract is not a Thomas Ryan tract. So there is left only the Huling survey, then owned by Ryan, to create any uncertainty. But the fact that two or more tracts come within the designation of a tract called for cannot invalidate a survey. It is to be determined from all the circumstances which of them was intended. And so determining here, there cannot be the slightest question but that it was the Thomas Ryan survey to which the survey ran.

[4, 5] 6. That the line of the Thomas Ryan survey, to and with which Stanfill ran the ninth and tenth lines, and the line of the Isaac Foster survey, to which he ran the eleventh line, were ideal lines, and hence he should have run those lines according to the courses and distances called for, and not have altered them in order to reach those lines of those surveys. The contention is that where there is a call for a line to run a certain course and distance to an ideal line of another survey, and a line run according to the course and distance called for will not strike such line, the call for such line is to be disregarded, and that as to the course and distance followed. By ideal line is meant not necessarily one that was not run, but one that is not actual. It is an open line as contrasted with one not marked. Of course a line that was not run is always an ideal line. It is open and not marked. The fifth or closing line of the Thomas Ryan survey at the time of the Mills survey was an ideal line. It was open and not marked, and the reasonable inference is that it was not run. The first four corners called for were timber corners, most, if not all, of which have been identified. The fifth corner is a stake corner. This indicates that the surveyor did not run beyond the fourth corner. He merely protracted the fourth and fifth lines. Likewise the eleventh line of the Isaac Foster survey was then an ideal line. It was open and not marked, and the reasonable inference is that it was not run. The first nine corners called for were timber corners, a number of which have been identified. The five other corners are stake corners. This indicates that the surveyor did not run beyond the ninth corner. He merely protracted the next six, including the eleventh lines. So that plaintiffs have made this

point good if their proposition of law is sound. Is it sound? They cite in support of it these four decisions of the Court of Appeals of Kentucky, to wit: Mercer v. Bate, 4 J. J. Marsh. (Ky.) 334; Ralston v. McClurg, 9 Dana (Ky.) 338; Mathews v. Pursifull (Ky.) 96 S. W. 803; Jones v. Hamilton, 137 Ky. 253, 125 S. W. 695. In each of these cases the call for the line of another survey was disregarded and that for course and distance followed.

In Mercer v. Bate, Judge Robertson said:

"But there is, in this respect, a palpable and essential difference betwixt actual and an ideal line, or a marked and open line. And as in the one case, Madison might be bounded by the marked line, wheresoever it might be (if he made no mistake), so in the other he must be restricted to the line as it appeared to be, and as he believed it was when he called to adjoin it. In the first case, he would have a right to the marked line, because, being visible, he knew where it was, and therefore intended that, as marked, it should be his boundary. In the last case, for the very same reason, wherever he supposed the invisible line to run, he must be bounded, because he intended when he made his survey to be, and therefore was bounded by it."

In Ralston v. McClurg, Judge Marshall said:

"In determining now upon the manner in which it should be closed, the courses and distances should be adhered to and the call for the line disregarded. There is certainly no necessity here for abandoning course and distance, which are in themselves certain. There is no mistake in the courses and length of the lines actually run, and the remaining courses and distances lead with certainty to the beginning. Why then abandon them, and adhere to a vague and repugnant call for a stake in a line of which the surveyor knew nothing, and for running with that line in a direction widely variant from its course and for a distance greatly exceeding its whole length?"

In Mathews v. Pursifull, Judge Carroll said:

"The rule is well settled that courses and distances yield to natural objects mentioned in a deed as the boundary line thereof; but this well-established rule does not apply to this case, because the calls relied on by appellant are not natural objects or monuments. They are merely artificial lines named in a patent."

In Jones v. Hamilton, Judge Barker said:

"The rule is that, where natural objects and courses and distances vary, the natural objects prevail; but where lines are not marked and defined so as to be visible to the eye, being merely called or ideal lines, the rule is different. There the surveyed line will prevail, and the party claiming title will be confined to those lines, although he may have believed and intended them to be identical with the called lines."

In Mathews v. Pursifull, Judge Carroll cited the decisions in Mercer v. Bate and Ralston v. McClurg in support of the position there taken, and, in Jones v. Hamilton, Judge Barker cited the decisions in Mercer v. Bate and Mathews v. Pursifull in support of the position there taken. It would seem that both Judges Carroll and Barker thought that where there is a call for a line to run a certain course and distance to an ideal line of another survey, and a line run according to the course and distance called for will not strike such line, the call for such line is to be disregarded, and that as to course and distance followed, as contended for by plaintiffs, and that this had been held in the two cases

of Mercer v. Bate and Ralston v. McClurg. Judge Carroll used the, epithet "artificial" in characterizing the lines which he had in mind, but it is not a correct epithet to designate ideal lines; for though ideal lines may be said to be artificial, so are marked lines. Ideal lines are open and invisible lines as distinguished from marked and visible lines. The antithesis of ideal lines is actual lines. So Judge Barker referred to called lines as synonymous with ideal lines. Such, however, is not the case. For though called lines are ideal lines, so are lines that were run, but not marked. Judge Sanford generalized these four decisions to this effect:

"That a course and distance called for in a survey, when not actually run and marked by the surveyor, will be controlled by a call for the line of another tract which was then actually marked and visible on the ground, so as to be assimilated to a natural object."

But they hardly yield such a generalization and are not relied on by plaintiffs as so doing. They are relied on as supporting their contention as I have stated it.

In determining the soundness of this contention there should be considered these four decisions cited and relied on by the defendant, to wit: Morgan v. Renfro, 124 Ky. 314, 99 S. W. 311; Alexander v. Hill, supra; Brashears v. Joseph (Ky.) 108 S. W. 307; Rock Creek Property Co. v. Hill, supra. In each of these four cases the call for course and distance was disregarded and that for the line of another survey followed.

In Morgan v. Renfro, Judge O'Rear said:

"In all such cases, where it comes to locate again the survey so made, the object is to reproduce if possible, or as near as may be, what was originally done in appropriating the land by the survey. * * * There are several means which may be adopted. The rule is to prefer the best evidence. Therefore marked corners, i. e., those clearly identified, and which are notorious objects, are seized upon as the most satisfactory; then natural objects not marked, such as a stream, a ridge, a cliff, or the like, for they, while not so exact, are nevertheless reasonably sure to afford satisfactory evidence of the location of the patent at or near that point; then calls for the lines of other patents which are of record, and which are susceptible of definite and certain location; then courses; and then distances, in the order named."

In Alexander v. Hill, Judge Lassing said:

"This patent calls for a tract of land bounded by certain natural objects and artificial lines and established points, and provides that by following certain fixed courses and distances these natural objects and artificial lines and fixed points will be reached. But when it is shown by actual demonstration that, when the lines are run according to the courses and distances called for, the natural objects and artificial lines and fixed points are not reached, what shall we do? Shall the courses and distances, as called for in the patent, prevail, or shall these be made to yield, and the courses so changed where required, and the distances extended as may be necessary so as to reach the natural objects, artificial lines, and fixed points? If this was a new question, we confess that a more difficult problem would be presented; but this court has many times passed upon this question, and the law is now well settled that, where there is a conflict between the course and distance and recognized objects establishing the boundary lines of a survey, course and distance must yield, and the natural objects and established boundaries of other tracts called for, and designated known points therein must be accepted as the true boundary of the land in question."

In Brashears v. Joseph, decided the same date as Alexander v. Hill, Judge Lassing said:

"Therefore the course and distance called for in the plat must yield, under the well-known rule that, where the patent calls for fixed, definite, and certain points or objects, the calls by course and distance must give way."

And in Rock Creek Property Company v. Hill, Judge Nunn said:

"The rule is well settled in this state that courses and distances must yield to calls for the lines of other patents which are of record and susceptible of definite and certain location."

It is thus seen that, if the four cases cited and relied on by plaintiffs support their contention, then these four cases cited and relied on by defendant are in conflict therewith; for an ideal line, i. e., an open and invisible line, whether actually run or only protracted, is susceptible of definite and certain location. It is to be noted that, though the decisions of Morgan v. Renfro, Alexander v. Hill, and Brashears v. Joseph were rendered and published before that of Jones v. Hamilton, no notice of them is taken by Judge Barker in his opinion therein. And in none of the four cases relied on by defendant is any reference made to the cases of Mercer v. Bate, Ralston v. McClurg, and Mathews v. Pursifull, though all were rendered and published before them, except that in Alexander v. Hill reference was made to Mercer v. Bate on another point. Brashears v. Joseph, Alexander v. Hill, and Rock Creek Property Co. v. Hill were built upon Morgan v. Renfro. This situation calls for an attempt at harmonizing these decisions, and, if it is found that they are incapable of harmonization, for a determination of which of them are right and to be followed. Particularly should pains be taken with the decisions in the early cases of Mercer v. Bate and Ralston v. McClurg. The opinions in them were delivered by great judges—Robertson and Marshall—and at a time when things were not so complex, i. e., more simple, and when judges, as well as other people, were less hurried and had more time for reflection. These decisions are very apt to have been sound. And it is to be seen whether there is any warrant in either one of them for the position which Judges Carroll and Barker took them to support. But before taking them up it will not be amiss to do a little thinking on our own account.

In determining the location of an actual survey, the fundamental principle is that it is to be located where the surveyor ran it. As it has been put, the thing to be done is to track the surveyor. This being so, it is where he ran and not where his certificate says he ran that governs. If there is a conflict between where he ran and where he thus says he ran, the latter must yield. In Dimmitt v. Lashbrook, 2 Dana, 1, Judge Robertson said:

"When a line is actually run, it must be, as so run, the true boundary."

In reflecting upon this I have been puzzled to reconcile it with the rule that parol evidence is inadmissible to vary a writing. I have reached the conclusion that there is no conflict here, because such a case does not come within the rule. The making of the certificate is not contemporaneous with the making of the survey, though made from notes taken at the time thereof. When it is made the making of

the survey is a thing of the past. It is a statement as to how the surveyor actually ran the lines. Just as, then, parol evidence is admissible as to what took place at a meeting of a board of directors or a town council by one who was present and heard what took place, and the minutes of the meeting made up from notes then taken, are not conclusive, so testimony of one, who was present at the survey, as to how the lines were actually run is admissible and the surveyor's certificate is not conclusive. The determining thing, then, in locating an actual survey, is to ascertain where the surveyor actually ran and not where he says he ran in his certificate. It is merely evidential as to where he actually ran. But, in the case of ancient surveys, no parol evidence as to where he actually ran the lines is obtainable, because of the death of all of those who may have been present at the survey. In such cases, in determining where the surveyor ran the lines, we are limited necessarily to his certificate except so far as may be affected by accompanying plat, and such marks as he may have made at the time of the survey, and, in the absence of such marks, to his certificate, except so far as it may be affected by the plat. In the latter case, of necessity, the certificate with such exception is conclusive. Where, however, there was no actual running, i. e., where the running was mental only, the certificate with such exception is always conclusive. Whilst here, as in the case of an actual survey, it is where the surveyor ran which is the determining consideration, there is no other evidence of where he so did than his certificate, apart from the plat. But it is to be construed in the light of then existing conditions and what he may be known to have done. Suppose, then, in a given case, according to the certificate, the surveyor ran from a certain point a certain course and distance to a certain thing, and a line from that point to that thing is not according to such course and distance, and the plat sheds no light, and there are no marks left by the surveyor, what is to be done? As it is not possible for the surveyor both to have run from such point to such thing, and from such point such course and distance, he must have made a mistake either in saying that he ran from such point to such thing, or that he ran therefrom such course and distance, and the thing to be done is to ascertain which of the two statements was a mistake. Two alternative cases present themselves for consideration. One is where the surveyor actually ran the line; the other where he protracted it, i. e., ran it mentally. And I take it that, in the absence of persuasive evidence that he did not actually run it, it is to be taken that he did. If, then, it is a case of actual running, and the thing to which he says he ran is a visible thing, either natural or artificial, he must have known whether or not he ran to such thing. He could not have been mistaken in thinking that he ran thereto if he did not. The only possible room for mistake in such case is in making notes of what he did or transcribing the notes into his survey, and there would be little chance of his making a mistake in this particular. In such case, therefore, that is, where the line was actually run, as the call is to run to a visible thing, the mistake is to be taken to have been made in the statement as to the course and distance. Such mistakes are readily made. So it is that we have the rule, as to which there is no question, that

where the call is for a natural object or a marked corner or line, the call for course and distance must give way to the call for such object, corner, or line. How, then, is it in case of actual running and the thing to which he says he ran is an invisible thing, i. e., an ideal or open line of another survey? In such case it is possible for him to have made a mistake in saying that he ran to such thing, if he did not run such line of the other survey, or otherwise know definitely where it was. If he did run it or otherwise knew, the likelihood of mistake is greatly lessened. Though, if he did not run it, the chance of mistake is greater, can it be said that the chance of mistake is greater than the chance of mistake in saying that he ran the course and distance? Possibly it is. If, then, there is a rule that, in a call for an ideal line of a survey, such call must give way to that for course and distance, here is a case for its application. And such case is where the line was actually run, and that of the survey called for was not run and he did not otherwise know where it was. But as, in such a case, it is well-nigh impossible to say whether the line of such survey was run, to see where it was located, or he otherwise knew, it is questionable, to say the least, whether any distinction should be made, where the line has been actually run, between a call for a visible thing and one for an invisible thing, and whether or not in both cases the call for course and distance should not yield to the call for the thing.

[6] Take, then, the other case, i. e., where there is evidence which persuades that the line was not actually run. If it was protracted, i. e., mentally run, is there any reason for a distinction between the call for a visible thing and one for an invisible thing? If the call is for a visible thing, as the surveyor did not run the line he was not at it. The fact that it was visible was of no value to him in knowing whether he ran to the thing. Unless he mentally ran to the thing, he would not have called for it. The chance for mistake in the course and distance to the thing over what it would have been had he actually run the line was much greater, and in some cases it would be marvelous whether he could give it correctly. There is therefore no reason for making a distinction, where the call is for a visible thing, between a case where the line was actually run and where it was not. And so the rule is that in case of such call always, i. e., whether the line was run or not, the call for course and distance yields to the call for the thing. If, then, where the line was not actually run, and the call is for a visible thing, the call for course and distance yields to the call for the thing, there is no conceivable reason why, in such a case, and the call is for an invisible thing, the rule should not be exactly the same. In such a case the call for a visible thing has no advantage, as a corrective, because of the visibility of the thing, over a call for an invisible thing. In neither case was the surveyor at the thing to determine whether he had gone to it or not. In the latter, as in the former, case, he would not have called for the thing if he had not mentally run the line to it. Such is the meaning of the call. It can have no other meaning. And the possibility of mistake in giving the course and distance is as great where the call is for an invisible thing as in a call for a visible one. I therefore see no reason why the rule should not be that in all cases,

whether the line was actually run or was not, and whether the thing called for was visible or invisible, that the call for the course and distance yields to the call for the thing.

There is reason, however, for an exception to this rule. This exception comes in only where the line was not actually run, and it makes no difference whether the thing called for was visible or invisible. The position thus taken that, if the line was not actually run, the call for the thing, whether visible or invisible, takes precedence over the call for the course and distance, is based on the assumption that the surveyor does not think that the thing called for is in a particular place. The exception comes in where he does think that it is in a particular place and hence mentally runs the line to that place. If it turns out that the thing called for at that place was not in fact there, i. e., the surveyor was mistaken in thinking that it was there, the call for the thing should give way to the call for course and distance; for the surveyor mentally ran the line to where he thought the thing was and not to where it in fact was. And the cases of Mercer v. Bate and Ralston v. McClurg were simply applications of this exception. In each case the line was not actually run, and the surveyor thought the thing called for was in a particular place, as to which he was mistaken. It was held in each case that the thing called for should give way to course and distance, because he had mentally run the line to where he thought the thing was and not where it actually was. It made no difference in the position there taken as to whether the thing called for was visible or invisible. A detailed consideration of these two cases will make this good.

In Mercer v. Bate the facts were these: Two surveys had been made in the then county of Kentucky of lands on the Ohio river some little distance below the falls at Louisville, one in the name of Mercer and the other in the name of Griffin. They were about 527 poles apart at the river bank. Mercer's survey was four-sided. Its upper corner on the river bank was three beeches and a sugar tree. The river line ran 350 poles to two beeches and some sugar tree saplings. The lower line ran from this corner S., 56 E., 1448 poles, to a sugar tree, buckeye, and linn. The back line ran from this corner N., 52 or 62 E., 350 or 340 poles, to a white oak on the edge of a hill near Harrod's creek, and the upper line ran from this corner N., 49 W., 750 poles N., 48 W., 540 poles, in all 1,270 poles, to the beginning. The lower corner of Griffin's survey on the river bank was an ash and elm. Its lower line ran therefrom 1,130 poles S., 38 E., to five ash trees, and from that corner the line ran N., 30 E. At 246 poles from the five ash trees in that line were a beech and elm. It is not necessary to refer to any more of the Griffin's boundary. Mercer's survey was made in 1774. That of Griffin some later. In 1785, the territory being then in Jefferson county, a survey was made in the name of Madison, including as it was thought all the land between the two surveys from the river back. It began at Griffin's lower corner—the ash and elm—and ran with the river bank to Mercer's upper corner—the three trees referred to as two beeches and sugar tree—427 poles. It called for this corner as Mercer's corner. The call for the next line was with Mercer's

corner S., 48 E., 540 poles, S., 49 E., 750 poles, in all 1,290 poles, to a white oak on the edge of a hill near Harrod's creek. It will be noted that the courses of these two parties of this line were the reverse of the courses given for Mercer's line. Mercer came to the river and Madison went back from it. The distances were exactly the same. Madison called to run with Mercer's line that far. Madison's lower corner back from the river was the same as Mercer's upper corner back therefrom, to wit, a white oak on the edge of a hill near Harrod's creek. The next call was "with Mercer's end (i. e., back) line S., 52 of 62 W., 116 poles to a beech and sugar tree in said line." From this corner the survey called for three lines, which took it to the beech and elm in Griffin's line, and to run from thence S., 30 W., 246 poles, to Griffin's lower back corner, the five ash trees, and from thence with Griffin's line N., 38 W., 1130 poles, to the beginning. It is thus seen that on the face of things Madison's survey covered all the land between Griffin and Mercer, and ran back of each to the extent of 246 poles of Griffin and 116 poles of Mercer. It turned out upon investigation that there was a mistake in the courses given for Mercer's upper line, connecting his upper corner on the river, the three beeches and sugar tree, and his upper back corner, the white oak on the edge of a hill near Harrod's creek. His upper and lower river corners and lower back corner were well marked. And the river line and lower line were also marked. For a distance of 380 poles, or 30 or 40 poles more than called for, his back line was also well marked. At the end of this marked line there was a white oak lying on the ground nearly rotten and so much decayed that it could not be told whether it was marked. It stood on the edge of a steep rocky hill, near and in view of Harrod's creek, so precipitous towards the creek as to render a descent to the base difficult even on foot. There was from this point an ancient marked line for the distance of 30 poles towards the beginning corner. If the upper line was run from the beginning corner, according to the courses reversed and distances called for, it would reach a point 426 poles, i. e., or over a mile and a third beyond the end of 380 poles of the marked back line of Mercer, where the white oak was lying, and from which the 30 poles of marked line ran towards the beginning corner at the river, thus making Mercer's back line 806 poles long instead of 350 or 340, as called for. The court held that the call for course and distance had to be disregarded, and that Mercer's back line extended no further than 380 poles of marked line, where the white oak was lying, and that his upper line ran from this point with the 30 poles of marked line, and from that point N., 36 W., 720 poles, N., 35 W., 540 poles, to the beginning. This location of the Mercer survey gave rise to the problem which is pertinent here. Should Madison run from Mercer's beginning corner on the river according to the courses and distances called for or with Mercer's line as the court held them to be?

There were over 2,000 acres within those lines. Possibly the surveyor never ran the river line of Madison's survey, i. e., from Griffin's lower corner to Mercer's upper and beginning corner. Certainly he never ran Mercer's upper and closing line, between its beginning and

fourth corners, nor his back line, a portion of which was called for as being the first of the three lines of Madison running from the beech and sugar tree in Mercer's back line to the beech and elm in Griffin's back line. The court held that Madison should run from Mercer's beginning corner according to the courses and distances called and not with Mercer's lines as called for; in other words, that the calls for Mercer's line should yield to the call for courses and distances. In the language of counsel for the losing side in their petition for rehearing, it tore "Madison from Mercer." Why then did the court so hold? It was because the surveyor thought that Mercer's upper and closing line ran according to the courses and distances called for and that his back line extended to the point where so doing would fix his fourth corner. So thinking, that was where he mentally ran. That he was mistaken in so thinking was no reason for making the survey run with Mercer's lines as they actually were. The surveyor only ran the lines of Madison where he thought the lines of Mercer were, and it is where the surveyor ran that governs. It is true that Judge Robertson made a point of the fact that Mercer's upper or closing line was an ideal or open line, except as to the 30 poles next to the upper back or fourth corner, and not an actual or marked line, and said, in the paragraph heretofore quoted, that there was a palpable and essential difference between an actual and ideal line, or a marked and open line. But the decision was not based on any such difference. Madison was restricted to the courses and distances called for in connection with Mercer's lines because such "appeared to" and were "believed" to be his lines when the Madison survey was "called to adjoin" Mercer. For the very same reason he would have been so restricted even had Mercer's lines been marked their entire extent. After the paragraph quoted, he proceeded as follows, to wit:

"Is there anything, then, in the record which will show satisfactorily where Madison supposed Mercer's line was when he called for it? We think there is enough, and that it shows that he considered the courses and distances described in Mercer's patent as defining his true line."

He then referred to seven separate and distinct things in the record as so showing. The decision provoked a vigorous petition for rehearing. Because of the distinction drawn between actual and ideal lines or marked and closed lines, it was thought that the court had taken the position "that if the objects called for are ideal or the lines called for are not marked, then the adjoining survey shall stop short thereof, and has no right to extend to them, disregarding of other calls." This position, it was claimed, was "entirely new." It was said:

"It is a doctrine never heretofore applied in adjudicating on boundary in this country, so far as we know. It was not advanced by the learned counsel of the appellants, so that it might have met a reply. Its consequences are not easily foreseen, and as there are many lines left open, owing to the witchery in which surveyors acted and the dangers that surrounded them, it may be fatal; for it is a doctrine that will rend bounds and limits, hereafter to be fixed by a series of adjudications."

The reasoning against this position which was advanced was unanswerable. Attention was called to the facts that Mercer's upper back

corner was a marked corner; that 30 poles of the upper or closing line from Mercer's upper or back corner towards the beginning corner was marked; and that the whole of Mercer's back line for 116 poles, of which Madison's third line was called to run, from the white oak at the upper or back corner to the beech and sugar tree, was a marked line. It was argued that if the first line of Madison was to be run to Mercer's beginning corner, which was marked, though the distance was 100 poles more than called for, so ought its second line to be run to Mercer's upper or back corner, which was marked, and its third line be run 116 poles with Mercer's back line, which was also marked.

The result was that Judge Robertson had nothing further to say, in response to the petition for rehearing, about any difference between the actual and ideal or marked and open lines. But he did bring out clearly and distinctly the true basis of the decision, which was that the surveyor took Mercer's upper or closing line to run according to the courses and distances called for, and that his upper or back corner was at the end of such line so run. Hence that is where he ran the Madison survey, and, as where the surveyor ran is controlling in locating a survey, there is where it would have to be located, though the surveyor was mistaken in so thinking. This being the case, it would have made no difference had such upper or closing line been marked its entire distance. He said:

"Madison cannot be allowed to extend his survey beyond where he believed Mercer to be."

And again he said:

"The reason why Madison would not be allowed to expand his survey, so as to cover all the interjacent land between the line which he supposed to be Mercer's and the remote boundary which is ascertained by the judgment of court to be Mercer's true line, is only because there was an evident mistake in the opinion as to the location of Mercer's line."

And again he said:

"If Madison went to T A (i. e., the upper back corner of Mercer), or if, knowing where it was, he intended to go there, or if, without knowing where it was, he intended to go to it, wherever it was, he might be allowed to hold it. The opinion states some of the reasons why we believe that he intended that his line and corner should be where he supposed Mercer's were."

That it would not have necessitated a different decision, if Mercer's upper or closing line had been marked its entire extent, is apparent from the following statement in the response:

"If Mercer's line from his beginning to T A had been marked and actually run, then still Madison might not have a right to make it his boundary, if it clearly appeared that he was mistaken in calling for it. But then we should require much stronger evidence of mistake than we should do, when the line was defined by course and not by marks."

So it transpired that, as nothing had ever been said about any distinction between actual and ideal or marked and closed lines in the

reported decisions of the Court of Appeals of Kentucky before Mercer v. Bate, so afterwards nothing was said in regard thereto therein for over 75 years, when it was taken up by Judges Carroll and Barker.

I come then to the case of Ralston v. McClurg. Ham's survey, there involved, was a five-line survey. It called to begin at William Richard's northeast corner of his 50-acre survey, a large poplar and beech. The first line ran from there, a certain course and distance, to a beech; the second from thence, a certain course and distance, to a beech and buckeye; the third from thence, a certain course and distance, to three white oaks on a high ridge; the fourth from thence, a certain course and distance, to a stake in Richard's line; and fifth and last a certain course and distance with his line to the beginning. The surveyor in making the survey began at Richard's northwest, and not at his northeast, corner, as stated in his certificate, which threw the whole survey off the land described therein. He ran and marked the first three lines. When he came to the fourth corner, the three white oaks on a high ridge at the end of the third line, Ham informed him that a line the course called for, to wit, S., 45 E., from that place would strike Richard's line at the distance called for, to wit, 83 poles. He thereupon adopted that as the fourth line of the survey without any part of it being run. He then calculated the course and distance from the termination of this assumed line to the beginning corner, and adopted it as the fifth line, without running it. On running the Ham survey it was found that a line S., 45 E., from the fourth corner, the termination of the third line, which was actually run, would not strike Richard's line at the distance of 83 poles, but that, if continued, it would never touch any part of it. It was held that the fourth and fifth lines should be located according to the courses and distances called for and the calls for Richard's lines should be disregarded. The ground of the decision was that there was where the surveyor mentally ran those two lines. He ran them there because he thought the fourth line would strike Richard's line and the fifth would run with it. In this he was mistaken. But, notwithstanding such mistake, that is where he mentally ran the lines, and, as we have seen, the consideration which always controls in locating a survey is where the surveyor actually or mentally ran the lines. That the fact whether Richard's line was an actual or an ideal—marked or open—line had nothing to do with the conclusion reached appears from the following quotation from Judge Marshall's opinion, to wit:

"It does not even appear that the line of Richard's was itself a marked line. And that circumstance, though not essential to the conclusion to which we have come, certainly weakens the opposite construction of the survey, so far as it depends upon the position that an actual marked boundary, or a call for physical objects, must control the call for course and distance."

It must be admitted, however, that both Judges Robertson and Marshall seem to think that the fact that the line called for was not a marked line, whilst not essential to the positions there taken, strengthened them. I would submit that it did not do so. The advantage which a visible thing called for has over an invisible thing when the

line is actually run does not exist when it is not run. And both these cases were cases where it was not so run.

It is thus seen that there is nothing whatever in these two cases justifying the positions taken in the quotations from the opinions in Mathews v. Pursifull and Jones v. Hamilton. Whether Mathews v. Pursifull was correctly decided on its facts it is not necessary to consider. It would seem that it was not. But Jones v. Hamilton was. There the survey began at Wiley Jones' corner, and the first call was "thence with said Jones line S., 80 W., 163 poles, to a beech and cucumber, Levi Goins' corner." This call was widely variant from "Jones' line." But the surveyor had actually run it. It was decided that the line should be located as thus run, though the surveyor intended and the patentees intended him to make a survey of all the land which would be included with "Jones' line" as a boundary, and they thought Jones' line coincided with the call S., 80 W., 163 poles. There were some marks on trees which led the surveyor to suppose that it was Jones' line. And the cases of Mercer v. Bate and Ralston v. McClurg were authorities for the decision reached. The only difference between that case and those was that in that the line was actually run, whereas in those it was not. There was no occasion in the case for pointing out any distinction between a call for marked and visible lines and ideal lines. It is true that the Jones line was not a marked line, but an ideal one. But it could have made no difference if it had been a marked one. The surveyor had actually run the line called for according to the course and distance called for, and as we have seen that it is where the surveyor ran, actually or mentally, that determines where the survey should be located. The fact that he thought that such line was the line called for, but was mistaken in so thinking, cannot change the fact as to where he ran, and hence does not allow the line to be located in accordance with the line called for, and that whether such line is a marked or an ideal line.

These four cases cited and relied on by plaintiffs do not, therefore, support their contention. The fact is that the cases of Mercer v. Bate, Ralston v. McClurg, and Jones v. Hamilton do not have to do with the kind of case that we have here. They are cases where the line called for was thought or supposed to be in a particular place, and was run to or with as being in such a place—in Mercer v. Bate and Ralston v. McClurg it was mentally run, whereas in Jones v. Hamilton it was actually run—when in fact it was not in such place. The fact that it was not in such place did not alter the fact as to where the line was so run, and it was the fact as to where it was run, and not where it might or would have been run had the truth been known, which determined its location.

On the other hand, the four cases cited and relied on by defendant are directly in point, and they decide squarely that if the line called for is susceptible of definite and certain location, at least if the instrument by which the line is created is of record, the call for course and distance must yield to it. Whether it is essential that such instrument be of record it is not important to inquire, as here the Ryan and

Foster surveys and patents were of record. An ideal line is susceptible of definite and certain location, though possibly not so susceptible and certain as an actual one. In Morgan v. Renfro, the first of the four cases in which this was settled, Judge O'Rear made no reference to the cases of Mercer v. Bate and Ralston v. McClurg. He may not have known of them. It is more likely that he did, and made no mention of them because it did not occur to him that they had any reference to the case in hand. In none of the four cases was it considered whether the line called for was an actual or an ideal line. It was not conceived that this made any difference. In Morgan v. Renfro and Brashears v. Joseph it does not appear whether the lines called for were actual, i. e., marked, or ideal, i. e., open. In Alexander v. Hill they were ideal, and in Rock Creek Property Company v. Hill they were actual. And, for the reasons heretofore given, there can be no doubt that those decisions are sound upon principle.

I conclude, therefore, that Stanfill did not err in going to and with the fifth or closing line of the Ryan survey and to the eleventh line of the Isaac Foster survey, and disregarding the calls for courses and distances.

7. That Stanfill erred in the point to which he ran as the pine corner at the thirteenth corner of the survey. This is attempted to be made out in two ways. One is that, if it is taken to be the three pine trees called for in the Parmley survey, it was not capable of being definitely located, and that because it was not sufficiently identified. But the mere fact that it was not then standing, and no one could tell where it stood, did not prevent its being definitely located. At least two other corners of the Parmley survey were capable of identification. According to Shearer's testimony, the sixth corner, the beech, poplar, and spruce, and according to Kinnie the third corner, the two white oaks and two Spanish oaks, were then standing. And to a certain extent the beginning corner was capable of identification, though the three Spanish oaks were not then standing, by reason of the call for them at the head of one of the Devil creek hollows. All the surveyors seem to have been able to locate this Parmley survey and its second or pine corner.

[7] The other is that there is another pine-tree corner which may have been the one intended to be called for, to wit, the beginning corner—three pines—of the Mills' survey of December 9, 1856, and it is impossible to tell which of the two was called for. The fact that there are two things which answer to the call of a survey, and it cannot be determined definitely which is the one called for, does not invalidate the survey. The rule is that the one which is most against the survey is to be taken. It is not unlikely that the beginning corner of this earlier Mills' survey was the corner called for. The seventh or closing line thereof, reversed, called for a red oak in Mills' line, i. e., the beginning line of the Parmley survey, then owned by Mills, and it may have been that the surveyor intended that the survey should run from the point in Isaac Foster's survey to the beginning corner of the Mills' survey of December 9, 1856, thence with the closing line thereof to the red oak in the first line of the Parmley survey, and thence with that line so

far as it went, to the beginning. If he so intended, then the survey ran from this pine corner with Mills to the beginning corner of the Parmley survey. That this adds another line to the survey is not against it. In Morgan v. Renfro the survey was of six lines. The fourth line called for a stake in line of John Gilbert, Sr.'s, survey, and the fifth with said line to a stake in his line. Just one line, therefore, of Gilbert's survey was called for. As the survey was located, it ran with four of Gilbert's lines and three lines were added to it. The case of Bell v. Powers (Ky.) 121 S. W. 991, involved a survey made by the same surveyor who made the survey in question here within seven months after it was made. The second call of the survey was, "thence with James Burnett's old line S., 25 E., 250 poles, to his corner, a pine." The Burnett line, from the beginning of the call to the pine, was not a straight line, but traversed four lines and three marked corners not recognized in the survey. It was held that the survey ran with these lines. As, however, running to the second corner of the Parmley survey was against the survey, plaintiffs cannot complain of Stanfill so running.

[8] This, I think, covers all the particulars in which it is claimed that Stanfill erred. The result of my consideration of them has convinced me that Stanfill's location is substantially correct, and that the decision in Alexander v. Hill is sound.

In conclusion it is to be noted that plaintiffs have done nothing but criticize. They have put forth no constructive effort. They have made no sincere effort to locate Mills' survey by actually running all its calls on the ground, disregarding calls for courses and distances for the thing called for, when running according to course and distance did not go thereto. The only line which they actually ran was the first line. This disclosing that Stanfill had erred in locating the first line, there they stopped. Whether they were fearful that running from the correct termination of the first line a location would be made more favorable to defendant does not appear. It is certain that they ran no further.

In view of all I have said, I have no other recourse than to hold that the bill should be dismissed at plaintiffs' costs.